UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>15-CR-20339-GAYLES</u>

UNITED STATES OF AMERICA

v.

VICTOR RAMIREZ,

      **Defendant.**

_____/

## FACTUAL PROFFER

The Defendant, Victor Ramirez, (the "Defendant"), and the United States of America agree that, had this case proceeded to trial, the United States would have proved the following facts, among others, beyond a reasonable doubt:

Starting in at least 2010, the Defendant— in conjunction with Matthew Pisoni ("Pisoni") and Marcus Pradel ("Pradel") (collectively, the "Defendants")—conspired with one another to operate a mail fraud scheme from offices located in the Southern District of Florida, and elsewhere. That is, the Defendant knowingly devised and participated in a scheme with Pisoni and Ramirez to obtain monies from victims in the United States, Canada, the United Kingdom, Japan, France, and other countries throughout the world, through false and fraudulent pretenses, representations and promises about sweepstakes winnings using the United States mail, knowing that the representations and promises about sweepstakes winnings were false and fraudulent, with the intent to induce victims into paying for sweepstakes winnings that did not exist. The scheme worked as follows:

The Defendant, as well as Pisoni and Pradel, registered numerous ambiguous LLCs in their

names, and the names of others, such as: Michael McKay, SpinMail, Mail Tree, Aveline Investments, etcetera. Many of these LLCs had misleading DBA names such as "Funds Administration," "Award Support Group," and "Prize Claim Notification." The Defendants conspired to contract two printers in the state of Nevada— Silverstate Printers and Western Printers— to print mass mailing letters composed by the Defendants in the names of the DBAs that were used to induce payments from the recipients. Once printed, the printers would send out the mailings to the victims (many of whom were over 65 years' old), using the United States mail, among other mail services, based on mailing lists provided to them by the Defendants.

The victims would then receive the personalized mailings, which always contained their names and were in their native language. On the front page of the mailings were markings which were used to mislead the victims into thinking the letters were official (i.e., bar codes, golden seals, letterhead, etcetera). The letters claimed the victims were either eligible for or entitled to a specific amount of prize money or notified them of a pending cash award. The letters further indicated that they needed to send a specific payment (between $25 to $50) to the DBA at the address provided in order to collect the winnings. Some of the letters contained small print disclaimers indicating that the payment would only entitle the recipient to a list of eligible sweepstakes monies available. But this small print was either placed on the back/second page or on the front page. No asterisks or other markings were ever present on the front pages of the mailings to direct the victims to read the small print. Contrary to the letters received by the victims, however, no one received the prize monies indicated in large print in the letters and/or lists of eligible sweepstakes.

The Defendants (mainly Pisoni and Ramirez, but on two occasions Pradel) also conspired to employ a network of mailbox runners in Las Vegas, Los Angeles, New York, Philadelphia,

Orlando, Vancouver, and Toronto, among other locations. The runners opened United States Postal mailboxes in their name (or, on three occasions, mailboxes opened in the names of other employees hired by Ramirez) to which the victims would send their payments as instructed in the mailings. The runners would collect the mailings from the mailboxes, open them, and send the checks to the Defendants' office in South Florida (if made in U.S. currency), or to companies engaged in processing foreign currency payments ("PPCs"), such as PacNet, Inc. The PPCs would process the foreign payments for a percentage of the payment and send the remaining monies to the bank accounts of the various companies set up by the defendants. If the payments were in U.S. currency, checks or cash would be deposited by the Defendants or, on a few occasions, by a select set of South Florida employees.

[THIS SECTION INTENTIONALLY LEFT BLANK]

In all, the Defendant's actions during the conspiracy resulted in a total loss of at least $11 million, resulting from payments from thousands of victims throughout the duration of the scheme.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 01/23/24   By: _____
ALEJANDRA L. LÓPEZ
ASSISTANT UNITED STATES ATTORNEY

Date: 01/23/24   By: _____
BROOKE WATSON
ASSISTANT UNITED STATES ATTORNEY

Date: 1/23/24   By: _____
RICHARD KLUGH
ATTORNEY FOR DEFENDANT

Date: 1/23/24   By: _____
VICTOR RAMIREZ
DEFENDANT

4